**Richard A. LIPPE, Archie R. Dykes, and John J. Robbins, as Trustees for Keene Creditors Trust, Plaintiffs,**

v.

**BAIRNCO CORPORATION et al., Defendants.**

**No. 96 Civ. 7600(DC).**

United States District Court, S.D. New York.

Jan. 28, 2003.

Levy Phillips & Konigsberg, LLP, New York City, Saiber Schlesinger Satz & Goldstein, LLC, By: David R. Gross, Rsq. Geoffrey Gaulkin, James H. Gianninoto, Newark, New Jersey, Budd Larner Rosen-

baum Greenberg & Sade, P.C., By: Kathleen Marchetti, Short Hills, New Jersey, for Plaintiffs.

Debevoise & Plimpton, By: John H. Hall, Steven Klugman, Jeremy Feigelson, Jennifer R. Cowan, Jeffrey I. Lang, Caroline H. Luckenbach, New York City, Schulte Roth & Zabel LLP, By: Irwin J. Sugarman, Michael S. Chernis, New York City, McCarter & English, LLP, By: Charles F. Rysavy, Alissa Pyrich, Newark, New Jersey, for Defendants.

### *OPINION*

CHIN, District Judge.

In this case, plaintiffs contend that in the 1980s, as Keene Corporation ("Keene") became the subject of a rapidly increasing number of asbestos claims, it engaged in a series of fraudulent conveyances intended to place hundreds of millions of dollars in assets beyond the reach of claimants. In 1981, Keene formed a holding company, Bairnco Corporation ("Bairnco"), and eventually Keene itself became a wholly-owned subsidiary of Bairnco. From 1983 through 1989, Keene transferred certain of its profitable businesses or divisions to newly created Bairnco subsidiaries. By 1993, after more than 100,000 asbestos lawsuits had been brought against it, Keene went into bankruptcy.

Plaintiffs, the Trustees of the Keene Creditors Trust (the "Trust"), brought this action on behalf of asbestos claimants to challenge the transactions as fraudulent conveyances. Plaintiffs' claims present two key factual areas of inquiry: (1) whether the newly-created subsidiaries paid "fair consideration" for the assets they purchased from Keene, and (2) whether the management of Keene and the purchasing companies acted with fraudulent intent, *i.e.*, with the intent to hide assets from Keene's creditors.

Before the Court are defendants' motions to exclude the testimony of three of plaintiffs' proposed expert witnesses: William J. Carney, a law professor who has provided an opinion as to the "business purpose" of the transactions in question, and Thomas E. Dewey, Jr., an investment banker, and Jocelyn D. Evans, a finance professor, who have provided opinions as to the value of the transferred businesses.

For the reasons that follow, the motions are granted: Professor Carney, Mr. Dewey, and Dr. Evans will not be permitted to testify at trial.

### *BACKGROUND*

#### A. *The Facts*

The facts are summarized in the Court's prior decisions in this case. *See, e.g., Lippe v. Bairnco Corp.*, 230 B.R. 906, 908–11 (S.D.N.Y.1999); *Lippe v. Bairnco Corp.*, 225 B.R. 846, 850 (S.D.N.Y.1998). The facts relating to the role of defendant Kidder, Peabody & Co. ("Kidder"), a former defendant in this case, are of particular relevance to the motion to exclude the testimony of plaintiffs' valuation experts. Kidder provided "fairness opinions" concerning the transactions in question. After the purchase price for each transaction had been set, Kidder determined the value of the company in question and then rendered an opinion as to whether the purchase price was fair. In every instance, Kidder concluded that fair consideration was being paid. These facts are summarized in the Court's decision granting certain motions to dismiss filed by Kidder and other former defendants. *See Lippe v. Bairnco Corp.*, 218 B.R. 294, 300 (S.D.N.Y. 1998).

#### B. *Carney*

##### 1. *Prior Proceedings*

Carney prepared a 129-page report, dated August 29, 2001, setting forth his opin-

ion as to the "business purpose" of the transactions in question. The report was the subject of prior motion practice in this case, as defendants moved to strike his report and to preclude him from testifying at trial.

By Memorandum Decision filed January 7, 2002, I granted the motion in part and I denied it in part. *Lippe v. Bairnco Corp.*, No. 96 Civ. 7600(DC), 2002 WL 15630 (S.D.N.Y. Jan.7, 2002). I held:

> Carney will not be permitted to give testimony stating ultimate legal conclusions; he will not be permitted to opine that the conveyances in question were fraudulent conveyances. Likewise, Carney will not be permitted to offer his personal assessment on the credibility of others or what others actually intended. He will be permitted to testify about corporate conveyances and transactions to help the jury understand the series of corporate transactions in question.

*Id.* at *3. I granted the motion in part because much of Carney's proposed testimony was improper, as he was proposing to tell the jury what result to reach—that defendants had engaged in fraudulent conveyances. He was proposing to tell the jury that defendants' witnesses were not to be believed and that their "real purpose" was "to remove the most valuable and promising business assets that Keene owned from the reach of its asbestos creditors." (Carney Report at 7, 9).[1]

Within just a few days after I issued my decision, defendants proposed to plaintiffs that the parties seek to agree on "which portions of Professor Carney's report survive the Court's ... ruling." (Cowan Decl. Ex. 4). Plaintiffs declined. Defense counsel then offered to mark up Carney's report first, to start the process of trying to reach an agreement. Plaintiffs again declined.

At Carney's deposition in May 2002, defendants again asked plaintiffs to set forth their position on what Carney could testify to, but plaintiffs again refused:

> MR. FEIGELSON: ... [A]re plaintiffs' counsel prepared at this time to respond to our request we've made before; and that is, to identify for us those parts of Professor Carney's report that you believe he will not be allowed to testify to at trial, in light of Judge Chin's opinion?
>
> MR. GROSS: No.
>
> MR. FEIGELSON: Are you prepared to tell us when, if ever, plaintiffs will give us that information?
>
> MR. GROSS: No.

(Carney Dep. at 138–39).

In fact, plaintiffs took the position at the deposition that if defendants asked Carney any questions about any topic in his report, Carney would be free to testify about those subjects at trial:

> MR. GROSS: ... [I]t is our position that if you do delve into areas that the judge has indicated, as you understand his order, are not proper, then we'll take

---

1. For example, Carney opined that: "the primary purpose for these transactions was to remove assets from the reach of Keene's asbestos creditors" (Carney Report at 1); "[t]he issue is whether the corporate changes were in fact driven by a desire to segregate Keene's assets from the increasing number of asbestos victims ... or could plausibly have been driven by some other motive independent of avoiding liability" (*id.*); "[t]he pattern is clear—an intent to remove assets from Keene

to shelter them from asbestos creditors" (*id.* at 4); defendants' "assertions are a rationalization to hide their real purpose, judging by what was accomplished, rather than by what Glenn Bailey and others may have said was their purpose" (*id.* at 7); "[t]he only logical motivating factor in these transactions was the attempt to remove assets from the reach of Keene's asbestos creditors" (*id.* at 9); and "Glenn Bailey['s] ... explanation lacks plausibility." (*Id.* at 99).

the position that anything you ask he has a right to testify about at this trial. Okay? . . .

MR. BURDETTE: David, if you're going to do that, you have to tell us what you think he is not allowed to—

MR. GROSS: I'll tell you what I need to tell you when I think I do, Brooks, not what you'd like me to tell you. Okay?

(*Id.* at 8–9).

Defendants proceeded to question Carney about his full report. Carney reiterated his understanding that he was going to testify as to the "business purpose" of the transactions in question:

Q. . . . Could you read aloud, sir, the first sentence under the heading Engagement?

A. "In the present matter I have been asked to provide my opinion as to the business purpose for the transactions . . . concerning Keene, Bairnco, and associated companies."

. . .

Q. And is the report as you understand it, in fact, a statement of your opinion as to the business purpose for these transactions? That is, did you do in your report what you said in the first sentence under Engagement here that you were going to do?

A. Well, I think others will have to judge my success in carrying out that enterprise, but it is my personal belief that I've been responsive to that request, yes.

Q. Was it your intention in this report to opine about anything else?

A. No.

Q. As you sit here today, do you have any understanding about what opinions you will be asked to offer at trial if you testify at trial?

A. I think that that single sentence probably sets that out as clearly as any I can say.

Q. Your opinion as to the business purpose for the transactions?

A. Yes.

(Carney Dep. at 139–42 (quoting Carney Report at 1)).

### 2. *Carney's Role As "Counsel"*

The discovery taken after my January 7, 2002 decision revealed that Carney was engaged as "counsel" by plaintiffs (and their attorneys of record) in October 1999. Carney sent a retainer letter, on letterhead of "William J. Carney, Attorney at Law," to plaintiffs' counsel on October 27, 1999. The letter, addressed to David R. Gross, Esq., reads in part as follows:

I am pleased that you have chosen me to serve as *counsel* to your firm in the above referenced litigation. . . . This letter will confirm the scope of my initial engagement and our fee arrangement for the services I will render.

Pursuant to my discussions with you, I will serve as *consultant* to you on certain issues of corporate law in the above referenced litigation. I understand that I may be asked to review certain documents and transactions to determine if I can serve, if requested, as an expert witness with respect to issues raised in the litigation. If, after this review, I determine that I am able to testify on behalf of your client, I will take such steps as may be necessary to prepare to testify at trial.

The fee arrangements described below are not contingent on my being able to testify. . . . The amount of time expended by me will be recorded and assigned a dollar value based upon my personal hourly rate, which is $375.

Certain charges for items performed on the client's behalf in rendering *legal*

*services*, such as filing fees, long-distance telephone calls, ... and the like are payable by the client.

(Cowan Decl. Ex. 9 (emphasis added)).

In fact, as the record shows, Carney acted as an attorney in the case. Although he called himself a "consultant" or "analyst" at times during his deposition, he freely acknowledged his job as "counsel." (Carney Dep. at 60, 80, 267, 498, 499). Indeed, over the course of his deposition he acknowledged his role as counsel or described himself as "counsel" or "legal advisor" numerous times.[2] More important than the label, however, was the actual role that Carney acknowledged he undertook: he carried out the traditional functions of a lawyer as he helped plaintiffs "explore and develop legal theories," "identify the legal issues and the facts—the kinds of facts that would be necessary to support various claims," "formulat[e] and develop[] issues and theories in the case," and "evaluat[e] the defense that would be put up in this case." (*Id.* at 60, 257, 507).

Other documents produced in discovery show that Carney acted as counsel. He placed the notation "CONFIDENTIAL—ATTORNEY WORK PRODUCT" on notes he prepared. He provided legal advice, in writing, as to plaintiffs' claims and legal theories and suggested areas for cross-examination of defendant Bailey. (Cowan Decl. Exs. 7–8, 10–14).

Notwithstanding his role as counsel, Carney is prepared to testify as an expert witness in this case, with respect to the very issues and theories that he helped formulate and develop in his role as a lawyer. (Carney Dep. at 507–08; *see also id.* at 344). In fact, Carney testified that he saw no tension or conflict "at all" in "developing [an] argument as counsel and then opining on it as an expert." (*Id.* at 344).

## C. The Valuation Experts

The valuation experts, Dewey and Evans, prepared reports in which they offered opinions as to the value of the companies that were the subject of the transactions in question. Evans also offered opinions on Keene's values at various times. In making their valuations, Dewey and Evans relied on the materials that Kidder had prepared back in the 1980s. Both Dewey and Evans were also deposed at length by defendants. In every instance, they concluded that the fair market value of the transferred assets far exceeded the consideration that defendants Bairnco, Kaydon Corporation ("Kaydon"), the Genlyte Group, Inc. ("Genlyte"), Kasco Corporation ("Kasco"), Shielding Systems Corporation ("Shielding"), and Arlon, Inc. ("Arlon") paid for them.

## D. Prior Proceedings

This case was filed in 1996. It has been heavily litigated, as the parties have engaged in extensive motion practice and voluminous discovery. There were numerous discovery disputes that required the

---

**2.** *See, e.g.,* Carney Dep. at 74 ("I was being retained as a legal advisor."), 80 ("I am a lawyer. When I do legal analysis and give legal advice I think of myself as being counsel to the firm that I'm employed by at that time."), 344 ("Q. Was this paragraph written as part of your role as counsel to help the plaintiffs develop theories of the case? A. Well, judging by the date, yes."), 397–98 (acknowledging he was "acting as counsel to the plaintiffs' lawyers" "at the beginning" and that he "continue[d] conducting a joint analysis [with plaintiffs' lawyers] after it became clear" he would be testifying as an expert), 713–14 (describing as "seamless" his work as "counsel to the Budd Larner firm" and his work as potential expert witness).

Court's intervention. Detailed agreements were reached, and approved by the Court, as to a schedule for discovery, fact and expert, and discovery closed long ago. Defendants filed summary judgment motions as well as these motions to exclude certain expert testimony, and both sets of motions are fully submitted. Trial is, and has been for some time now, set for March 31, 2003, just nine weeks away.

I heard argument on the instant motions on January 10, 2003. At the outset, in an effort to focus the argument, I gave the lawyers my preliminary views based on my review of the motion papers. (1/10/03 Tr. at 3–12). Instead of proceeding with argument, however, plaintiffs' counsel asked for a recess. When the session reconvened, plaintiffs' counsel asked for the opportunity, on another day, to call Carney, Dewey, and Evans as witnesses so that the Court could hear their testimony in person. (*Id.* at 13–17). I declined to adopt the suggestion, in part because all three had been deposed at length and the transcripts of their depositions were part of the record. I indicated, however, that if I were to conclude, upon further review of the matter, that testimony would be helpful, I would advise the parties. I indicated that otherwise I would rule on the motions. (*Id.* at 19–22, 62). The parties proceeded to present their oral arguments.

## DISCUSSION

### A. *Applicable Legal Principles*

#### 1. *Expert Testimony Generally*

■ A witness qualified as an expert will be permitted to testify if his or her testimony " 'will assist the trier of fact to understand the evidence or to determine a fact in issue.' " *United States v. Lumpkin,* 192 F.3d 280, 289 (2d Cir.1999) (quoting Fed.R.Evid. 702). To be admissible, expert testimony must be both relevant and

reliable. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). As the Court explained in *Daubert,* the trial judge's task is to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597, 113 S.Ct. 2786. The trial judge's "gatekeeping" obligation applies not only to "scientific" testimony but to "technical" and "other specialized" knowledge as well. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

■ In 2000, in response to the Court's decision in *Daubert* and decisions that followed, including *Kumho Tire,* Congress amended Rule 702 of the Federal Rules of Evidence. As amended, Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. The proponent of expert testimony must establish its admissibility by a preponderance of the evidence. *See Astra Aktiebolag v. Andrx Pharms., Inc.,* 222 F.Supp.2d 423, 487 (S.D.N.Y.2002) (citing Fed.R.Evid. 104(a) and *Bourjaily v. United States,* 483 U.S. 171, 175–76, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)); *Cayuga Indian Nation v. Pataki,* 83 F.Supp.2d 318, 322 (N.D.N.Y.2000) ("[I]t is the proponent's burden ... to establish admissibility, rather than the opponent's burden to establish inadmissibility." (internal quota-

tions omitted)); Fed.R.Evid. 702 advisory committee's note (2000 Amendments) ("[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence."). Rejection of expert testimony, however, is still "the exception rather than the rule," Fed.R.Evid. 702 advisory committee's note (2000 Amendments), and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land,* 80 F.3d 1074, 1078 (5th Cir.1996).

### 2. *Reliability*

■ Hence, to be reliable, expert testimony must be based on sufficient facts or data and it must be the product of reliable principles and methods properly applied. The trial court's task

> is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167. In other words, expert testimony should be excluded if it is "speculative or conjectural," or if it is based on assumptions that are " 'so unrealistic and contradictory as to suggest bad faith' or to be in essence an 'apples and oranges comparison.' " *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996) (quoting *Shatkin v. McDonnell Douglas Corp.,* 727 F.2d 202, 208 (2d Cir.1984)). Expert testimony is inadmissible if it makes no effort to account for major variables, such as, in a discrimination case, possible nondiscriminatory explanations for statistical disparities. *Bickerstaff v. Vassar Coll.,* 196 F.3d 435, 449–50 (2d Cir.1999). An expert opinion is inadmissible if it "is connected to existing data only by the *ipse dixit* of the expert," for a "court may conclude that

there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *accord* Fed.R.Evid. 702 advisory committee's note (2000 Amendments) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.' ") (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1319 (9th Cir.1995)).

■ The reliability requirements do not preclude an expert from testifying on the basis of experience alone or in conjunction with other knowledge, training, skill, or education. *See* Fed. R. Evid 702 advisory committee's note (2000 Amendments) ("[E]xperience ... may [ ] provide a sufficient foundation for expert testimony."). But an expert basing his opinion solely on experience "must do more than aver conclusorily that his experience led to his opinion," and he must do more than "propound a particular interpretation of [a party's] conduct." *Primavera Familienstifung v. Askin,* 130 F.Supp.2d 450, 530 (S.D.N.Y.2001). Rather, an expert who is relying "solely ... on experience ... must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid 702 advisory committee's note (2000 Amendments).

■ The trial court has latitude in deciding how to test an expert's reliability. *Daubert* listed a number of factors, but this "list of factors was meant to be helpful, not definitive." *Kumho Tire,* 526 U.S. at 151, 119 S.Ct. 1167. Hence, factors that a trial court *may* consider include, among others: whether a theory or technique relied on by an expert can be and has been tested; whether the theory or technique has been subjected to peer review and

publication; whether there is a known or potential rate of error; whether the theory or technique has been generally accepted in the relevant community; whether the discipline itself lacks reliability; where an expert's methodology is experience-based, whether the methodology has produced erroneous results in the past and whether the methodology has been generally accepted in the relevant community; and whether an expert's method is of a kind that others in the field would recognize as acceptable. *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786; *Kumho Tire*, 526 U.S. at 151, 119 S.Ct. 1167.

### 3. *Relevance*

In addition to being reliable, expert testimony must be relevant. An expert opinion is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R.Evid. 702; *see Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 ("This condition goes primarily to relevance."). Expert testimony is not relevant if the expert is offering a personal evaluation of the testimony and credibility of others or the motivations of the parties. *See United States v. Scop*, 846 F.2d 135, 142 (2d Cir.1988), *rev'd in part on other grounds*, 856 F.2d 5 (2d Cir.1988) (citing *United States v. Richter*, 826 F.2d 206, 208 (2d Cir.1987)); *Lumpkin*, 192 F.3d at 289 ("Fundamental to the role of juror as trier of fact is the task of assessing witness credibility."); *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir.1994); *GST Telecomms., Inc. v. Irwin*, 192 F.R.D. 109, 110–11 (S.D.N.Y.2000) ("[I]t would be inappropriate to consider the experts' personal assessments of the credibility of the situations involved, the sufficiency of the measures utilized in considering the business plans being pursued, . . . and the impact of self interested conduct and the significance thereof."); *Kidder, Peabody & Co. v. IAG Int'l Accep-*

*tance Group, N.V.*, 14 F.Supp.2d 391 (S.D.N.Y.1998) (granting motion to preclude expert testimony of law professor who sought to opine that party had acted reasonably and in good faith, holding that these were questions for the jury); *Taylor v. Evans*, No. 94 Civ. 8425(CSH), 1997 WL 154010, at *2 (S.D.N.Y. Apr.1, 1997) ("[M]usings as to defendants' motivations would not be admissible if given by any witness—lay or expert."). As the Second Circuit has explained:

> When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.

*Duncan*, 42 F.3d at 101.

An expert's role is to assist the trier of fact by providing information and explanations; the expert's role is not to be an advocate. Experts "perform a very different function in litigation than that of the lawyer; they do not serve as advocates, but as sources of information." *EEOC v. Locals 14 & 15, Int'l Union of Operating Eng'rs*, No. 72 Civ. 2498(VLB), 1981 WL 163, at *4 (S.D.N.Y. Feb.11, 1981). Indeed, " '[w]hen expert witnesses become partisans, objectivity is sacrificed to the need to win.' " *Cacciola v. Selco Balers, Inc.*, 127 F.Supp.2d 175, 184 (E.D.N.Y.2001) (quoting *Rubinstein v. Marsh*, No. CV–80–0177, 1987 WL 30608, at *7 (E.D.N.Y. Dec.19, 1987)); *see also Primavera Familienstifung*, 130 F.Supp.2d at 529 (granting motion to exclude expert testimony where witness "does not serve as an expert but, rather, seeks to supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence").

### B. *Application*

#### 1. *Carney*

The motion to preclude Carney from testifying is granted. Carney's role

and proposed testimony were ill-conceived from the outset. Clearly, plaintiffs envisioned that he would be giving, in essence, a summation from the witness stand. As his report and deposition testimony make clear, Carney was going to do his best to persuade the jury that the "business purpose" of the transactions in question was an improper one—that defendants' "real purpose," their true motivation, in engaging in the transactions was to hide the assets from asbestos creditors. Plaintiffs envisioned that Carney would testify to and summarize the relevant facts (as to which he had no personal knowledge) and then opine—or, more accurately, argue— that defendants were intending to defraud asbestos claimants by engaging in fraudulent transactions. But this is what a lawyer does in his or her summation to the jury. This is not the function of an expert witness. Carney's views as to the credibility of defendants' witnesses and defendants' "real" motivations are simply not relevant.

To compound the problem, Carney acted as counsel for plaintiffs. He functioned not just as an expert witness providing information, but he carried on the traditional functions of a lawyer-advocate—developing arguments and theories, anticipating and preparing responses to defendants' defenses, and preparing lines of cross examination. Carney saw himself as "counsel" to plaintiffs' lawyers and he acted in a completely partisan manner. It would be most inappropriate to permit him now to testify as an expert witness about the very matters he helped develop as a lawyer-advocate.

Plaintiffs seek to salvage at least part of Carney's testimony by delineating the areas they believe would be permissible under my prior ruling. This effort comes too late. I ruled more than a year ago that Carney could testify as to certain matters

only. Defendants attempted, starting more than a year ago, to identify and agree on the permissible areas of testimony, but plaintiffs steadfastly refused to even discuss the matter. Indeed, it was not until oral argument and in a letter submitted after the argument that plaintiffs made any effort to identify the areas they believed were permissible. Trial is just a few weeks away, however, and discovery closed long ago. After years of litigation and discovery, I will not permit a new round of expert discovery now.

In addition, at this point, in light of what discovery has revealed, I have no confidence that Carney could limit his testimony to permissible areas. As he made clear at his deposition, the entire focus of his report was his thesis that defendants' "real purpose" in entering the transaction was to hide assets and it was still his belief that the "business purpose" of the transactions was going to be the substance of his trial testimony. (Carney Report at 7, 9; Carney Dep. at 141–42). I do not believe that he can now sanitize from any testimony his views as to defendants' motivations and the credibility of their witnesses. Moreover, because of his advocacy on behalf of plaintiffs as counsel and legal advisor, I do not believe that he can now testify with the detachment and independence that one would expect from an expert witness offering views as a professional.

Of course, many expert witnesses are biased and the lack of bias is not required for expert testimony to be admissible. *See* 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* §§ 702–59 to 60 & n.38 (Joseph M. McLaughlin ed., 2d ed.2002). But here plaintiffs have gone too far, for they seek to call as a witness someone who has acted as their attorney, with a "duty ... to represent [his] client[s] zealously within the bounds

of the law." N.Y.Code of Prof'l Responsibility EC 7–1 (McKinney 2002).

Defendants' motion to exclude the proposed testimony of Carney is granted, in its entirety. Carney will not be permitted to testify at trial.

### 2. *The Valuation Experts*

■ The motion to preclude Dewey and Evans from testifying is also granted, for I am simply not persuaded that their proposed testimony rests on a "reliable foundation." *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786. Rather, in many if not most instances, their conclusions are speculative or conjectural; they are unrealistic and contradictory; they do not account for major variables; they are "apples and oranges" comparisons; or they are based solely on their say-so. Dewey's opinions are based largely on his experience, but he makes no effort to explain how his conclusions were reached, why the conclusions have a factual basis, or how his experience is reliably applied. Evans, on the other hand, has no experience in the area; although she has academic qualifications, she has never made a valuation of a business nor has she even reviewed one. The lack of experience shows.

I provide examples of the problems with their opinions that lead me to conclude that the reliability requirements have not been met.

#### a. *Dewey*

#### 1. *Failure to Use DCF Method*

Many authorities recognize that the most reliable method for determining the value of a business is the discounted cash flow ("DCF") method. *See, e.g., Frymire–Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 186 (7th Cir.1993) (referring to DCF method as "the methodology that experts in valuation find essential"); Shannon P. Pratt et al., *Valuing A Business: The Analysis & Appraisal of Closely Held Companies* 154 (4th ed.2000) [hereinafter Pratt, *Valuing a Business* ] ("[R]egardless of what valuation approach is used, in order for it to make rational economic sense from a financial point of view, the results should be compatible with what would result if a well supported discounted economic income analysis were carried out."). In fact, Dewey was criticized by the United States District Court for the District of Columbia in 1984 when he offered an expert opinion on the value of two companies and "dismissed and rejected summarily the discounted cash flow analysis without offering any justification or reasons." *In re Nat'l Student Mktg. Litig.,* 598 F.Supp. 575, 581 (D.D.C.1984). Yet, in this case, he does precisely that: he elected not to do a DCF analysis and when asked at his deposition why he did not, he responded: "I can't tell you. I didn't try." (Dewey Dep. at 205).[3]

By failing to use the DCF method and relying solely on the comparable companies method, Dewey did not have an ability to do a "check" on his determinations. (*Id.* at 73). Moreover, Dewey applied the comparable companies method in what even he described was a "quite mechanical" way—taking a price/earnings ("P/E") ratio from "Kidder's comparables," multi-

---

**3.** In his report, Dewey made some effort to explain. He wrote that the DCF method is "one of several mathematical approaches to valuation most often used" in certain situations. (Dewey Report at 4). He then explained: "In that the Keene companies do not fit the cases enumerated above, however, based on my professional experience as an investment banker, I do not believe the DCF method is necessary in these cases, and have not performed such analyses." (*Id.*). Of course, plaintiffs' other expert (Evans), defendants' experts, and Kidder all performed the DCF analysis.

plying that number by what he "thought was the appropriate earnings level in each case," and then adding a control premium. (*Id.* at 131–32, 514). As discussed more fully below, he did not analyze in any detail the information provided by Kidder, which was otherwise available, and he made no adjustments to the inputs. (*Id.* at 151).

## 2. *Lack of Range of Values*

Common sense and the authorities in the area suggest that an opinion as to the value of a business should be expressed as a range of values rather than as a single number. *See, e.g., Harris Trust & Sav. Bank v. Ellis,* 810 F.2d 700, 706 (7th Cir.1987) ("'Fairness' is a range, not a point."); Arthur Keown et al., *Financial Management: Principles & Applications* 23–6 (9th ed. 2002) ("[N]o single dollar value exists for a company."); Aswath Damodaran, *Investment Valuation: Tools & Techniques for Determining the Value of Any Asset* 4 (2002) (valuation analysts must allow themselves "a reasonable margin for error"). Richard A, Lippe, one of the plaintiff trustees, testified at his deposition that "all you can ever do in addressing value is address a range." (Lippe Dep. 4/12/02 at 27). Yet, Dewey expressed his conclusions as single numbers, except for Cutting Services, for which he provided a range. (Dewey Report at 6–11, 12).

## 3. *Lack of Reliance on Principles and Methods*

Rule 702 explicitly requires that an expert's conclusions must be "the product of reliable principles and methods." Yet, Dewey made clear at his deposition that this is not the case with respect to his opinions. He testified:

— in the late 1970s and 1980s, he was not familiar with the writings of academics on business valuation (Dewey Dep. at 63);

— he did not pay "much attention" to differences in valuation approaches taken by investment bankers on the one hand and academics on the other because he had his "own approach and this is the way [he has] done it for 40 years" (*id.*);

— he had not "done anything in the last five years to keep up with the literature on a business valuation" (*id.* at 66);

— he is "not in the practice of reading" publications on the valuation of businesses, although he is aware they exist (*id.* at 56–57; *see also id.* at 428–29); and

— he does not care what authorities on valuation say or what the typical practice is in the investment banking field with respect to aspects of business valuation or whether other investment bankers or academics share his view that the comparable companies valuation method is the "gold standard" (*id.* at 77–78, 80, 84 85).

As a consequence, the reliability of Dewey's method of valuing a business cannot be tested. (*See id.* at 428 ("Q. Now, if somebody wants to test the reliability of your valuation and conclusions, what does one look to? A. I wouldn't know how to answer that."), 689 ("Q. . . . [Y]ou assumed that if there was a sale of the business involved, there would be a premium? A. That's correct. Q. How could one test that assumption, test its veracity or validity? A. I'm not sure I could answer that.")).

## 4. *Dewey's Failure To Explain His Analysis*

At his deposition Dewey was unable to explain how he reached many of his conclusions:

— he used a 19x price/earnings ratio in an initial valuation of Cutting Services, but he had "no idea" where the 19x multiple came from (*id.* at 197);

— in valuing the Shielding businesses, he relied on a management *projection* of $2.94 million in earnings for 1987 when the *actual* earnings for the prior three years dropped from $3.65 million in 1984 to $1.96 million in 1985 to $959,000 in 1986 because he believed Shielding "pretty much had it turned around," but he said "I don't know where I got this impression from" (*id.* at 233–34; Bairnco Mem. Ex. B. at KP 937);

— in valuing Shielding, he did not consider certain companies that were competitors, but he could not say what his "thought process" was (Dewey Dep. at 826–27);

— with respect to Versitron, Dewey had available to him certain information concerning comparable transactions and he even acknowledged that "[i]t might very well be ... appropriate" to look at it; he chose not to do so but could not explain why (*id.* at 791–92); and

— with respect to Kaydon, Dewey acknowledged that he reached a "very different value conclusion than Kidder did," he further acknowledged that Kidder did a "good job" collecting the data and used "appropriate methodology," and he maintained that his conclusion was "better" than Kidder's, but he could not articulate why his opinion was better other than to say "because I did it" (*id.* at 473–77).

The absence of explanations for so many of Dewey's decisions makes it extremely difficult for a jury to evaluate his testimony.

### 5. *Control Premium*

Another area where Dewey fails to provide an adequate explanation is his decision to apply a control premium. Because of the significance of this area, I discuss it separately.

Dewey first calculated "trading value" for the companies and then he added a control premium. Clearly, the control premium is the principal reason Dewey arrives at valuations substantially above Kidder's. In the case of Kaydon, for example, Dewey arrived at a "trading value" for Old Kaydon of $120.1 million; to this figure he added a control premium of $70.1 million, 58.4% of the "trading value." Hence, Dewey concludes that the fair value of Old Kaydon was $190.2 million, substantially above the $97.5 million consideration in cash, assumed liabilities, and tax payments paid for the company. (Dewey Report at 5–6; Kaydon Mem. at 7).

The problem, however, is that Dewey is unable to provide any concrete basis for his decision to apply a control premium in each of the valuations in question, nor is he able to provide any basis for the amount of the control premium he applied. As he testified with respect to Arlon:

[I]n that case, there were no facts which led us to add the control premium, and let me go on from that and say I have to answer that to every one of these questions because the control—the way we did this, it's entirely theoretical, and our assumption in doing theoretical valuations is that if the company changed ... hands it will be at a control premium.
Q. Is it relevant to the theoretical valuation that you did whether there were prospective purchasers for the company other than the affiliated purchasers that we know did buy the companies?
A. No, I understand. It would be relevant if you could determine contemporaneously that there were or were not;

but given the fact that we were doing this as a theoretical exercise, we assumed in each case that there would be somebody.

(Dewey Dep. at 664). Hence, Dewey applied a control premium in each case because he was doing this as a "theoretical exercise" and "assumed" that there would be a prospective purchaser. He acknowledged that the issue of the existence of "prospective purchasers" would be "relevant" if the existence of prospective purchasers could be determined. Yet, Dewey had "no facts" as to the existence—or nonexistence—of prospective purchasers (*id.*), and he never considered the possibility that there would be no purchasers willing to pay a premium. (*Id.* at 668–69; *see, e.g., id.* at 676 ("no idea" whether there was "somebody out there willing to pay a premium" to Keene for Arlon)). Hence, in the case of Kaydon, Dewey applied a 58.4% premium, or $70.1 million, based on the "assumption" that there were purchasers willing to pay a premium, when he had "no facts" as to the existence of any such purchasers.

For Shielding, Dewey applied a control premium of 41.8%, again without considering whether there existed prospective buyers who were willing to pay a control premium. (Dewey Dep. at 307–08). He even acknowledged that "you have to take ... into account" whether there was "evidence that there were people willing to come and pay more." (*Id.* at 308). Yet, even though he "didn't see any" such evidence, he applied the control premium anyway, again because he was engaging in a "theoretical exercise." (*Id.* at 307–08). To compound the problem, Dewey applied the 41.8% premium after accepting, without any real basis, a projection that Shielding would *triple* its earnings from the year before when Shielding had been on a three-year slide. (*See supra* pg. 690).

Of course, as he had to, Dewey acknowledged that a control premium is not paid in every sale of a business. He agreed that "[s]ometimes it's appropriate to add a control premium and sometimes it isn't." (Dewey Dep. at 682). He agreed that a control premium could be "zero or two percent," depending on "the particular circumstances." (*Id.* at 366; *accord id.* at 687). He agreed that "there is always a chance that whatever company you are valuing could have no purchaser." (*Id.* at 465; *see id.* at 651–53, 660–63). He conceded, with respect to the Lighting division, that "if ... there was no buyer, no independent buyer ... in 1984, it would [have been] inappropriate to apply a control premium in determining the fair value of those businesses." (*Id.* at 539). Yet, he failed to consider whether such buyers actually existed. (*Id.*). Instead, he assumed they existed and engaged in a purely "theoretical exercise." His conclusions, therefore, amount to no more than theoretical speculation. *See, e.g., Estate of Godley v. Comm'r,* 286 F.3d 210, 215 (4th Cir.2002) ("A premium for control or discount for lack of control may be appropriate *as a factual matter* for several reasons." (emphasis added)); *Ahmanson Found. v. United States,* 674 F.2d 761, 770 (9th Cir. 1981) (holding that district judge did not err in declining to apply a control premium where party advocating application of such a premium did not prove existence of prospective buyer who was willing to pay a premium); *Eckelkamp v. Beste,* 201 F.Supp.2d 1012, 1028 (E.D.Mo.2002) (rejecting expert's valuation that included a control premium as "too speculative" where evidence established that "there was no hypothetical buyer lurking in the bushes"). In fact, the record contains uncontradicted evidence that there was no independent buyer for the Keene lighting business in 1984 (except perhaps at a bargain sale price). (Genlyte Ex. 9 at 6–7, 15;

Heller Dep. at 414; *see* Dewey Dep. at 539).

To be clear, it is not Dewey's *conclusion* that a control premium should be applied that is problematic; it is his utter failure to offer a meaningful explanation as to why he reached that decision in each of the different factual scenarios and it is the absence of any facts or data as to the existence of prospective buyers who would be willing to pay a premium.

Dewey's conclusions as to the amount of the control premium in each instance are just as speculative. He applied premiums ranging from 37.1% to 58.4% of the "trading values" that he calculated. (Dewey Report at 6–12). Dewey relied on certain broad information provided by Kidder as to premiums "offered" for certain proposed transactions in a range of industries, only some of which were actually consummated. (Kaydon Ex. 1 at KP 507–14, Genlyte Ex. 16 at KP 1064). Dewey used portions of this data without any consideration as to whether it was appropriate to do so, *e.g.,* whether the companies in question were comparable. (*See, e.g.,* Dewey Dep. at 452–53, 461–62). At one point, he changed a control premium from 47.8% to 42.7% and when asked why he made the change, he responded: "I have no idea." (*Id.* at 553–54).

### 6. *Dewey's Failure To Consider Variables*

■■■ On some occasions, Dewey failed to account for certain variables that seemingly would have affected value. In making a comparable companies analysis, one looks to P/E ratios of comparable companies. Of course, companies are not completely comparable merely because they are in the same industry, and often factors such as product and geographic markets, size, growth rates, profit margins, and other industry and economic considerations warrant adjustments. *See, e.g., In re Radiology Assocs., Inc. Litig.,* 611 A.2d 485, 489–90 (Del.Ch.1991); Shannon P. Pratt, *The Market Approach To Valuing Businesses* 29 (2001) [hereinafter Pratt, *Market Approach*].

With respect to Cutting Services, there is data available as to an arms-length transaction in the same time frame involving a comparable company, ASC. Dewey conceded that this was "the only comparable thing there was out there." Yet, he gave it no weight in his analysis and he could not explain why. (Dewey Dep. at 214–15). Of course, if he had added the ASC information, the value he placed on Cutting Services would have been lower. (*See* Bairnco Mem. at 23).

■■■ With respect to Shielding, Dewey looked at only one comparable company, Hexcel, relying on its P/E multiple of 17.9x. (Dewey Dep. at 255, 267–68). This was problematic. First, reliance on only one comparable is, as Dewey acknowledged, "marginal." (*Id.* at 254). Second, there were significant differences between Shielding and Hexcel, and Dewey admitted that the companies were "[n]ot that close." (*Id.* at 256; *see id.* at 822, 829–30). Yet, Dewey did not even consider making an adjustment. (*Id.* at 274). Third, he concluded that certain competitors were not comparable, but he could not say why. (*Id.* at 825–27).

With respect to Kaydon, Kidder adjusted the median P/E ratio obtained from looking at two comparable companies, Barden and New Hampshire. Dewey could see the facts that caused Kidder to make the adjustment. (Dewey Dep. at 430). He acknowledged that the P/E ratios for both New Hampshire and Barden for the period in question were significantly higher than their respective ratios for the prior period. (*Id.* at 419–20). Yet, Dewey declined to

make any adjustment, without offering any explanation other than stating, in a conclusory manner, that he does not discount for depressed earnings because "the stock market does that" for you. (*Id.* at 403–04; *see id.* at 423–24).

### 7. *Dewey's Errors*

Finally, Dewey's conclusions also lack sufficient indicia of reliability because of the many errors in his analyses. For example:

— in valuing the Lighting Division, Dewey used earnings figures for comparable companies that were net of taxes and interest while he used earnings figures for the Lighting Division that were net of taxes but *not* net of interest (Dewey Dep. at 548, 549–50, 577–78 (acknowledging such a comparison would be "wrong" and "meaningless"));

— with respect to Lighting, Dewey used the trailing four quarters rather than income projections for the full calendar year 1984, which he agreed would have been preferable, because he believed that P/E ratios for the full calendar year 1984 were not available (Dewey Report at 7; Dewey Dep. at 579–81); in fact, this information was provided by Kidder (Genlyte Ex. 16 at KP 1051; Dewey Dep. at 581);

— in valuing Cutting Services, Dewey missed Kidder's decision to make two adjustments (one up and one down) and he made only one upward adjustment; he conceded that he made a mistake (Bairnco Mem. Ex. A at KP 3521–22; Dewey Dep. at 201–03);

— in valuing Shielding, Dewey used a P/E ratio for Hexcel based on *trail-*

*ing* earnings and compared it to Shielding's *projected* 1986 earnings (Dewey Dep. at 832–33); this was wrong (*see id.* at 842 (acknowledging he would have arrived at a lower multiple)); and

— when he was apprised that he put a premium on M & A multiples, he was asked: "Is that another mistake?" and he responded: "Yep. Probably." (*Id.* at 817–18).

### b. *Evans*

### 1. *The Keene Valuations*

 Evans made certain valuations of Keene on various dates to support plaintiffs' contention that Keene was "insolvent." For these valuations, lower values would support plaintiffs' claims as plaintiffs contend that Keene's worth was less than the probable cost of its liabilities. In contrast, for the valuations of Keene's businesses that were sold, higher values are necessary to support plaintiffs' claim that the assets were transferred for less than fair consideration. Hence, like Dewey, Evans added substantial control premiums to her valuations of the transferred businesses, ranging from 40% to 59.8%. (*See* Evans Report at 5, 11, 13, 14, 17, 18–19, 20–21). Yet, she added no control premium to her Keene valuations, even though she "valued Keene pursuant to the same standard of value that [she] valued each of the other divisions." (Evans Dep. at 455–56, 457–59).[4] She testified that she "could" add a take-over premium to the valuations of Keene, but claimed that she did not have the necessary information. (*Id.* at 455). In fact, however, she had no less information for Keene than she did for the divisions and she had no difficulty add-

---

4. Evans purported to give "going-concern fair market value[s]" for both the components and for Keene itself. (Evans Report at 3, 21; Evans Dep. at 82, 127–29, 458–59).

ing control premiums to her valuations of the divisions.

The Keene valuations, on their face, make no sense.

Evans concluded that Keene had a value of $520.7 million in May 1986 and a value in January 1987 of $95.7 million—a $425 million or 82% decrease in value in just seven months. (Evans Report at 22–23). In the absence of some catastrophic event (not covered by insurance), it makes no sense that a $520 million dollar company would lose $425 million of its value in just seven months. At her deposition, Evans effectively conceded this:

> Q. As you sit here right now, though, you believe the value of Keene fell 425 million dollars from May '86 to January '87?
>
> A. Again, I will go back and review it.

(Evans Dep. at 489).

The January 1987 value of $95.7 million for Keene also makes no sense when compared with Evans's valuations of Keene's components. At that time, Keene still owned Versitron, Micro Chassis, and Arlon, so the $95.7 million had to have *included* their worth. Yet, when Versitron and Micro Chassis were sold in April 1988, according to Evans, they had values of $120.8 million and $29.2 million, respectively. When Arlon was transferred in June 1989, according to Evans, Arlon had a value of $101.9 to $198 million. She also placed a value on what remained of Keene in June of 1989—at which point all three components had been sold—of $128.59 million. Those numbers—the values of Versitron and Micro Chassis as of April 1988 and of Arlon and what was left of Keene as of June 1989—total $380.49 to $476.59 mil-

lion. (Evans Report at 11–13, 17–18, 24; *see* Bairnco Mem. at 53).[5]

Evans's conclusion that Keene would have been worth only $95.7 million in January 1987, when it still owned all three components, makes no sense when compared to her conclusion that the three components and what remained of Keene together were worth $380.49 to $476.59 million—four to five times as much—after the components were transferred. Plaintiffs have made no effort to explain this inconsistency, and the only logical explanation is that Evans was striving to minimize the value of Keene and maximize the value of the components.

### 2. *Versitron and Micro Chassis*

Keene purchased Versitron and Micro Chassis in 1984 for $15 million and $4 million, respectively. Versitron experienced severe financial setbacks in 1986 and 1987 and it was performing poorly when Keene sold it in 1988. (Bairnco Mem. Ex. C at KP 1138, 1143). Micro Chassis was also performing poorly when it was sold in 1988. (*Id.* at KP 1138, 1145). Evans recognized that "during the time Versitron and Micro Chassis were sold, they were ... firms that were not performing well." (Evans Dep. at 493). Yet, Evans concluded that Versitron had a value in 1988—just four years after it was purchased for $15 million—of $120.8 million. (Evans Report at 12–13). Even Dewey came up with only a $32.4 million value for Versitron. (Dewey Report at 10). Similarly, somehow Evans came up with a value of $29.2 million for Micro Chassis when Keene sold it in 1988, just four years after Keene bought it for only $7 million. (Evans Report at 13). Even Dewey gave Micro Chassis a value of only approximately $1.7 million. (Dewey

---

**5.** These values include Evans's control premiums for Versitron, Micro Chassis, and Arlon; without the control premiums, the total value

for all the components would still be, under her analysis, $298.89 to $366.39 million. (*See* Bairnco Mem. at 53).

Report at 11). Evans provides no explanations for these seemingly unrealistic evaluations.

One likely explanation for Evans's unrealistic values is that she misread Kidder's documents. She cited a Kidder document in support of her assumption that Versitron's cash flow would increase by 10% per year after 1993. In fact, the document contained a reference by Kidder to management's projection that *sales*—not cash flow—would increase at a rate of 10%. Rather, projections in the document show that both management and Kidder had predicted Versitron's cash flow to decrease overall. (Bairnco Mem. Ex. C at KP 1219, 1220, 1224).

3. ***Evans's Lack of Confidence & Experience***

At her deposition, Evans demonstrated a lack of confidence in her own conclusions. For example, she testified as follows:

— "I think that my valuation is wrong. I think I may have overstated the value. I will go back and reanalyze that." (Evans Dep. at 477).

— "I am going to go back and reconsider it and rethink my rationalizations for why I used December 1984, and then at this point in time I am not going to say it's wrong. I have to go back and rethink and see why I used December 1984. I had a rationale. At this point in time, it escapes me. . . ." (*Id.*).

— "I think that I need to go back and think about the rationale." (*Id.* at 479).

— "I said that I need to go back and think of my rationale, and I did have a rationale, just like right now late in the day—I asked for the opportunity to go back and re-analyze it." (*Id.* at 480).

— "So, all I can say is I will go back and reanalyze that and I will reestimate the cash flows for Keene based upon only the subsidiaries that Keene had at those specific dates." (*Id.* at 489).

— *"I have not done enough analysis.* I will go back and review it." (*Id.*) (emphasis added).

— When asked to explain her use of a 5% annual growth rate for cash flow in perpetuity, she responded: "I cannot find now the rationale from this documentation. . . . And, again, I would have to go back to all the information I looked at." (*Id.* at 504–05).

— She was unable to respond to questions about her failure to consider ASC in her valuation of Cutting Services:

A. Define what you mean by whether I have looked at [ASC]. In specific detail, what does it mean when you say I have looked at [ASC]?

Q. Did you consider [ASC] division in connection with your valuation of cutting services?

A. What does consider mean?

(*Id.* at 501–03).

— With respect to Shielding, when asked what she was referring to when she stated in her report that "[t]he 1988 present value of $94.895 equals $57.428 million," she responded: "At this point in time, I don't have enough detail in my report to answer it." (*Id.* at 517 (internal quotations omitted)).

— When asked if "the discounted cash flow evaluation for Shielding is wrong," she responded: "It appears to be." (*Id.* at 518).

Evans also disclosed that she had never valued a company before:

Q. . . . Prior to your retention in this case, have you ever been employed for the purpose of valuing a company?

A. No.

Q. And have you ever been employed to review someone else's valuation of a company?

A. No.

Q. And have you ever been asked to reach a valuation conclusion regarding any company?

A. No.

Q. And have you ever been employed to value a stock interest in a company?

A. No.

Q. And have you ever been employed to do any kind of business valuation?

A. No.

(*Id.* at 52–53).

Evans's own lack of confidence in many of her conclusions, coupled with her lack of experience, undermines the reliability of her findings.

### 4. *Comparables*

In making a comparable companies analysis, of course, a valuation expert must consider earnings data from comparable companies. The more comparable a company, the more relevant its data. If there are differences between the comparables and the company being valued, adjustments should be made. (*See* Evans Dep. at 254–55). Here, Evans relied solely on plaintiffs' counsel to tell her what the comparable companies were. She did not try herself to determine whether the companies actually were comparable or whether there existed other companies that were more comparable that plaintiffs' counsel had not brought to her attention. She did not make any adjustments. She testified with respect to the analysis of Shielding as follows:

Q. And who concluded that that one company was comparable?

A. Again, I had asked David Gross' law firm to have somebody do an analysis of the comparable companies for each one of these transactions.

Q. Did you—

A. I did not do it myself.

Q. Did you determine that [Hexcel] Corp. was comparable to Shielding?

A. I did not determine that myself.

(*Id.* at 521). Of course, it is unclear who actually did the analysis or whether that person is competent to determine whether a company is a "comparable" for these purposes.

In fact, Evans asked *defense counsel* if Hexcel was a comparable:

A. I know I looked at the information here and—[Hexcel] is a comparable firm, one of the comparable firms?

Q. That is your opinion. That is for you to tell me, Dr. Evans.

A. Is it stated as one of the comparable firms? That's why I am asking you that.

Q. Dr. Evans, as you sit here today, do you recall doing that same level of analysis with respect to [Hexcel]?

A. I have to see the information that was given and I will tell you the level of analysis that I did with respect to [Hexcel].

(*Id.* at 527).

Likewise, with respect to the Lighting Division, she testified that she relied on plaintiffs' counsel to determine whether there were comparables and that she made no independent effort to determine the existence of comparables. (*Id.* at 304–05).

Kidder found that there was a lack of public comparables for Versitron. (Bairn-

co Mem. Ex. C at KP 1139). It also determined that Hexcel was *not* comparable to Shielding and looked at other comparables instead. (Bairnco Mem. Ex. B. at KP 933). Evans rejected Kidder's views and applied a P/E ratio of 21.3 for Versitron and used Hexcel as a comparable for Shielding, but she did so without explaining why and without any independent analysis of whether the supposed comparables actually were comparable.

### 5. *Control Premium*

As noted, like Dewey, Evans added substantial control premiums to her valuations of the transferred businesses. As with Dewey, her decision to add a control premium assumed the existence of prospective purchasers willing to pay a premium, but she had no information as to the existence of any such potential buyers. (Evans Report at 3–4; Evans Dep. at 155, 269–70, 275–276, 340–43, 377, 381–88, 507–09). Her decision to add a control premium to each of the transactions was not based on any facts or evidence as to the existence of a company that would have been prepared to pay a premium because of, for example, potential synergies or economies of scales or a "potential for some added value." (Evans Dep. at 269). For example, she testified:

> Q. Do you have any basis for stating that in 1983 there was an actual party that would have been willing to pay a control premium to acquire Kaydon?
>
> A. I have no basis for stating that there was an actual party willing to pay Kaydon a control premium. . . .

(*Id.* at 270). She also testified:

> Q. And you, in fact, have never done any analysis at all in terms of whether or not any of the companies that existed at the time were actually potential acquirers of the Keene lighting businesses?

A. That is true.

(*Id.* at 388). By *assuming* the existence of prospective buyers willing to pay a premium in every instance, Evans was relying not on facts or data but instead was engaging in rank speculation.

Evans also added a control premium to her DCF analyses. (*See* Dewey Report at 5, 11, 13, 17, 18–19, 20). As a general matter, however, the addition of a control premium to a DCF analysis is not consistent with proper and usual valuation practice. In a DCF analysis, the company's projected cash flow is already part of the analysis—one predicts the company's future cash flow, and these projections should take into account any expectations of improved earnings. A DCF analysis looks to the value of the entire business and not the value of a minority interest. As one of defendants' experts explained in an article cited by plaintiffs:

> A control premium is normally not applicable to a discounted cash flow valuation, because a DCF calculation values the cash flows of the entire company. As discussed above, the DCF method sets an upper limit on value. If the future cash flows of a company are worth $10 million, why would anyone pay more?

(Kaydon Reply Mem. Ex. B at GEM 13). The expert does acknowledge the possibility that a buyer might pay a premium in certain circumstances, but those circumstances would require a different (and higher) DCF analysis, and Evans pointed to no facts to show that such a higher DCF analysis was warranted for any of the situations in question.

Evans applied a 59.8% takeover premium to her valuation of Kaydon because she concluded that Kidder had identified 36 takeover transactions in similar industries from 1981–1983 and that Kidder "report-

ed" that "acquirers of comparable firms in similar industries *paid* 59.8% above these firms' existing market value." (Evans Report at 5 (emphasis added); *see* Kaydon Ex. 1 at KP 507). But that is not what the document shows. Rather, the document summarizes information from 36 "selected" transactions involving machinery manufacturing companies. Moreover, the chart does not indicate whether these transactions actually closed. It purports only to list premiums "offered" and it does not on its face give a figure of 59.8%. (Kaydon Ex. 1 at KP 507). Evans did not determine whether these transactions closed, whether the companies in question actually were comparable, or whether any adjustments were warranted. (Evans Dep. at 280–84). She did testify that she looked at "the Houlihan reports that [were] produced in 1986" for information on control premiums. (*Id.* at 283–84). In fact, however, the Houlihan study upon which she purportedly relied was produced in 1996 and covers transactions that closed in 1995–1996. (Kaydon Ex. 10).

### 6. *Other Flaws*

Numerous other flaws exist with respect to Evans's calculations. For example:

— Evans reached highly divergent conclusions as to the value of Versitron. Using the DCF method, she produced a value of $120.8 million. Using the comparable companies method, she produced a value of only $32.4 million. (Evans Report at 12–14). Instead of re-examining her calculations, Evans simply discarded the lower one and adopted the value more favorable to plaintiffs. *See* Pratt, *Market Approach, supra*, at 233 ("[W]hen income and market approach results diverge, one should check carefully whether the analysis leading to the choice of market multiples is consistent with

the analysis leading to the choice of discount or capitalization rates."). Evans acknowledged that "the multiples approach and the discounted cash flow approach should give you the same number." (Evans Dep. at 167). There was a substantial divergence with respect to Old Kaydon as well, $105.8 million with the DCF method and $144.3 million with the P/E method, before adding a control premium. (Evans Report at 5). When the control premium is added, the disparity is even wider: $169.1 million and $230.6 million. (*Id.*). When asked at her deposition whether she had tried to reconcile the divergent valuations, she responded "it's very difficult and I could not." (Evans Dep. at 177).

— Evans agreed that "fair market value" is the price "that two independent parties having access to information would arrive at through an arm's-length negotiation where neither party was under compulsion to act." (Evans Dep. at 127–28 (internal quotations omitted)). Yet, she seemingly determined her valuations of the components of Keene based on the concept of the "best possible price." (Evans Report at 2 ("Under the fair market approach, Keene had an obligation to sell each subsidiary to Bairnco at the best possible price."), 3 ("I believe that an arms-length sale of a business' assets as a going concern requires management to obtain the highest market value for all of the stakeholders, shareholders and creditors, matured and not yet matured."); Evans Dep. at 144–45 ("the highest price"), 457). "Best" and "fair" are not the same. *See* N.Y. Debtor & Creditor Law § 272 (McKinney

2002) (defining "fair consideration" as "fair equivalent therefor" or "not disproportionately small").

— Although Cutting Services' sales had been flat for five years (Bairnco Mem. Ex. A at KP 3520), Evans projected that after 1986 its cash flow would grow at an annual growth rate of 5%. (Evans Report at 20). Her report offers no explanation for her conclusion that cash flow would grow, in perpetuity, at the rate of 5% per year and she was unable to provide any explanation at her deposition. (*Id.;* Evans Dep. at 504–05). Similarly, Evans used a constant growth rate of 5% in certain other DCF analyses as well.

— In her valuations of Keene, Evans used only a single year's projected cash flow in her DCF analyses. The use of cash flow projections for only one year is inconsistent with the concept of a DCF valuation, which relies on a stream of cash-flow projections. *See* Pratt, *Valuing a Business, supra,* at 186 (three to ten years is typical).

— Evans used Old Kaydon's higher earnings for the twelve months ending December 31, 1982 to calculate its value as of October 1983 (Evans Report at 8; Kaydon Ex. 1 at KP 582; Evans Dep. at 259–66); this was error, for she should have used the earnings for the twelve months ending October 1983, which were lower, as did Kidder and Dewey; by using higher earnings figures from an earlier time period rather than the lower but more current and therefore more appropriate figures, Evans came up with a much higher valuation; in doing so she did not follow generally accepted principles. *See* Pratt, *Valuing a Business, supra,* at 255.

### c. *Plaintiffs' Response*

■ In their moving papers, defendants set forth in detail numerous errors, problems, and other indicia of unreliability in the reports and conclusions of Dewey and Evans. Many, but not all, are described above. Plaintiffs respond, in their opposition papers and at oral argument, with remarkably few details.

Two arguments warrant further discussion. First, plaintiffs argue that there is a "presumption" that expert testimony is admissible, and suggest that even "shaky" evidence is admissible. (*See* Pls.' Opp'n Mem. at 5–6 (citing *Borawick v. Shay,* 68 F.3d 597, 610 (2d Cir.1995))).[6] Second, plaintiffs suggest, in response to the Court's inquiries and concerns at oral argument, that the Court "is acting as a juror." (1/10/03 Tr. at 55). Underlying both arguments are the notions that the alleged problems in the testimony go to weight, not admissibility, and that the opinions of the expert witnesses are best tested in the context of a trial when jurors will be able to see and hear them testify, both on direct and cross.

**6.** Although there is language in *Borawick* that "*Daubert* reinforces the idea that there should be a presumption of admissibility of evidence," 68 F.3d at 610, other courts have observed that "[l]imitations of the Rules of Evidence on expert opinion testimony are strictly enforced in the Second Circuit." *GST Telecomms., Inc. v. Irwin,* 192 F.R.D. at 110 (citing *Kidder, Peabody,* 14 F.Supp.2d at 402). What is clear is that the proponent of expert testimony must show its admissibility by a preponderance of the evidence. *See supra* pgs. 685–86. In practical terms, my view is that in a close case the testimony should be allowed for the jury's consideration. In a close case, a court should permit the testimony to be presented at trial, where it can be tested by cross-examination and measured against the other evidence in the case.

This case, however, is not a close one. Even assuming there is a presumption of admissibility, defendants clearly have overcome it. They have demonstrated not only that the opinions of Dewey and Evans are "shaky," but that the opinions are so unreliable—"so unrealistic and contradictory"—as to suggest bad faith or, at a minimum, as to constitute an "apples and oranges" comparison. I am convinced that Dewey and Evans had only one goal in mind—to come up with conclusions that would support plaintiffs' positions in the case, and they were determined to get to that point anyway they could. I conclude that Dewey and Evans are unlikely to "assist the trier of fact" because their opinions are speculative and conjectural, their opinions are not based on sufficient facts or data but instead are based largely on their own say-so or on unfair and one-sided interpretations of the available data, they do not apply reliable principles and methods in a fair and reliable way, and they make no effort to account for major variables that one would expect to have an impact on their conclusions. Taken together, these flaws and failings go far beyond weight. Exercising my role as "gatekeeper," I conclude that the opinions of Dewey and Evans are so unreliable they are inadmissible.

## CONCLUSION

For the reasons set forth above, defendants' motions to exclude the proposed expert testimony of Carney, Dewey, and Evans are granted. Professor Carney,

Mr. Dewey, and Dr. Evans will not be permitted to testify at trial.[7]

SO ORDERED.

---

7. Plaintiffs' request for an opportunity to present the testimony of Carney, Dewey, and Evans at an evidentiary hearing is denied. Plaintiffs' request comes too late. The parties and the Court never contemplated such a hearing, and it was not until oral argument that plaintiffs requested an opportunity to call witnesses. Moreover, the testimony would add nothing. The parties have provided a voluminous record, which includes the experts' reports, complete transcripts of the experts' depositions, documents reviewed by the experts, transcripts of depositions of other witnesses, and treatises on valuation. The experts have had a full and fair opportunity to explain their opinions.