### In re MED DIVERSIFIED, INC., et al., Debtors.

### Chartwell Litigation Trust and Gregory L. Segal as Trustee of Chartwell Litigation, Plaintiffs,

### v.

### Addus Healthcare, Inc., an Illinois Corporation; W. Andrew Wright, an Illinois Individual; Mark S. Heaney, an Indiana Individual; Courtney E. Panzer, an Illinois Individual; and James A. Wright, an Illinois Individual, Defendants.

Bankruptcy Nos. 02–88564, 02–88568, 02–88570, 02–88572, 02–88573.
Adversary No. 04–08680.

United States Bankruptcy Court, E.D. New York.

Nov. 14, 2005.

James M. Sullivan, Esq. (JS–2189), McDermott Will & Emory LLP, New York City, Howard J. Steinberg, Esq. (pro hac vice), Michael H. Strub, Jr., Esq. (pro hac vice), Irell & Manella LLP, Los Angeles, CA, Co-counsel to the Plaintiffs.

Robert A. Scher, Esq. (RS–2910), Foley & Lardner LLP, New York City, Scott E. Early, Esq. (pro hac vice), Ellen Wheeler, Esq. (pro hac vice), Jill L. Murch, Esq. (pro hac vice), Christopher J. Werner, Esq. (pro hac vice), Foley & Lardner LLP, Chicago, IL, Counsel for the Defendants.

## MEMORANDUM OF DECISION AND ORDER GRANTING, IN PART, AND DENYING, IN PART, PLAINTIFFS' MOTION IN LIMINE TO EXCLUDE THE REPORT AND TESTIMONY OF THE DEFENDANTS' EXPERT WITNESS.

STAN BERNSTEIN, Bankruptcy Judge.

### Issue

In this adversary proceeding filed by the Chartwell Litigation Trust and its Trustee

(Plaintiffs), to recover an alleged constructive fraudulent transfer of $7,500,000,[1] the narrow issue under submission is whether the Defendants' proposed expert witness, Scott P. Peltz (Peltz) is qualified and whether his purported expertise satisfies the standards of relevance and reliability under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and ensuing precedents. In this case, the Defendants called Mr. Peltz as a purported expert in business valuations to testify on the value of 100% of the shares of the defendant, Addus Healthcare, Inc. (Addus), a privately held company, as of February 14, 2002.[2] The proposed witness was also called to testify on the reasonably equivalent value of an alleged option payment of $7.5 million paid by the Plaintiffs' predecessor in interest, Med Diversified, Inc. (Med D), for a 6½ month extension to close its purchase of these shares.

In exercising its role as the gatekeeper, this Court has determined that the proposed witness has not satisfied the *Daubert* standard as to his direct testimony, but that he may testify as a rebuttal witness to the Plaintiffs' proposed expert witness in valuation, limited, however, to issues of methodology used by the Plaintiffs'

expert witness, Robert Cimasi (Cimasi) in valuing these shares and the "option price" or the extension payment.[3] Under these circumstances, Mr. Peltz's Expert Report and direct testimony are struck from the record of this adversary proceeding, and an evidentiary hearing date has been set for his rebuttal testimony on methodology. Since this particular issue has not been discussed by any other bankruptcy court, this Court has taken the pains to present a comprehensive analysis of the gatekeeper function in the hope that it may be useful to other bankruptcy judges, the business bankruptcy bar, and, tangentially, the bankruptcy law professoriat.

### Background and Procedural History

In order to make sense of the importance of the Plaintiffs' motion in limine within the context of this adversary proceeding, it is necessary to go back to the transactional sequence for the abortive purchase of the Addus shares. On January 8, 2002, Med D and Addus entered into a Stock Purchase Agreement (SPA) in which Med D agreed to purchase all of the shares of stock of Addus. The principal terms of the SPA required Med D to pay Addus: (1) $15 million in cash, which was to be deposited into a joint escrow account

1. In order to avoid a transfer as a fraudulent transfer under § 548 of the bankruptcy code, the debtor must show that the transfer was made within one year before the date the petition was filed, and that the debtor: "(i) received less than reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred ...." 11 U.S.C. § 548(a)(1)(B). The parties have stipulated that Plaintiffs' predecessor in interest, Med Diversified, Inc., was insolvent when the $7.5 million transfer occurred on February 14, 2002, and there is no dispute that the transfer was made within one year of the filing of the petition.

2. More than 90% of the shares of Addus were owned or controlled by the Defendant W. Andrew Wright.

3. The qualifications of plaintiffs' proposed expert witness on valuation, Robert Cimasi, were subject to a reciprocal motion in limine filed by the defendants to disqualify him from testifying. Mr. Cimasi was also subject to an extensive voir dire conducted over three business days, with active participation by the Court. Without ruling on his qualifications or the admissibility of his Expert Report and testimony at trial, the Court permitted him to testify and to be cross-examined extensively, subject to defendants' reserving their motion in limine, with the opportunity to have all or part of his testimony stricken.

upon execution of the agreement, (2) $22.5 million in notes secured by a pledge of the Addus stock and payable to the Addus shareholders, and (3) $20 million in shares of Med D stock, which were to be issued at closing. In addition, Med D was to pay all outstanding debt owed by Addus, which was approximately $36.2 million,[4] and up to $3 million in debt, plus accrued interest, owed to the principal shareholder of Addus, W. Andrew Wright (Wright).[5] On January 8, 2002, Med D deposited $15 million into a joint escrow account. The closing date for the transaction was set for January 24, 2002 under the terms of the SPA.

The closing did not take place January 24, 2005. Instead, the parties entered into a Modification to the SPA (Modification), which extended the closing date to February 14, 2002, and provided that Addus was to receive a $40 million promissory note instead of the $20 million in Med D shares that was provided for in the SPA. Thus, as modified, the sales price under the SPA was approximately $116.9 million.[6]

What happened next is in material dispute.[7] Both parties agree that sometime before February 14, 2002, Med D and Addus began negotiating an additional "amendment" to the SPA, as amended by the Modification. This amendment was purportedly memorialized in a document entitled First Amendment to the SPA (First Amendment), *but this document was never signed by the parties.* The First Amendment purportedly gave Med D an "option" to purchase all of the Addus shares at anytime before September 1, 2002—a six and a half month period—for $7.5 million. Alternatively, this $7.5 million may also be deemed a payment in consideration for an extension of time for Med D to perform its obligations under the Modification. The $7.5 million was to be released from the joint escrow account upon the joint execution of the First Amendment and paid to the Defendants. In simplified terms, under the First Amendment Med D lost its right to a credit against the Exercise Price or Purchase Price of $1 million of the $7.5 million upon expiration of each successive month until the total amount was exhausted at the end of the six and a half-month period. If the First Amendment were valid and enforceable—an issue to be determined at the conclusion of the trial—then Med D's failure to close the acquisition by the end of this 6½ month period would have the effect of Med D forfeiting any right to recover any part of the $7.5 million.

On February 13, 2002, from the $15 million on deposit under the joint escrow account, $7.5 million was transferred to Med D, and $7.5 million was released to Addus and/or Mr. Wright. In fact, all of the $7.5 million was immediately trans-

---

4. This figure is comprised of $27,283,333 of bank debt and $8,896,333 in existing outstanding Letters of Credit. *See* SPA.

5. A debt was allegedly owed by Addus to Mr. Wright for advances of working capital, which was approximately $3,235,000, with accrued interest.

6. For purposes of this opinion only, the Court will assume that, under the terms as set forth above, the sales price or the exercise price of the "option" was approximately $116.9 million. This price has a direct bearing on

whether the $7.5 million payment received by the Defendants was a constructive fraudulent transfer, made by Med D when, as all parties have stipulated, Med D was insolvent, for less than reasonably equivalent value.

7. The resolution of this dispute is reserved for the Memorandum, Order and Judgment that will be issued after the conclusion of this trial and the submission of the Plaintiffs' and the Defendants' respective post-trial proposed findings of fact and conclusions of law, and memoranda of law.

ferred to Mr. Wright. Within a very short period of time, Mr. Wright advanced $4 million of these proceeds back to Addus, and used the $3.5 million balance for his other personal investments that were unrelated to Addus. Med D did not close the deal to purchase Addus by August 31, 2002, and Mr. Wright retained the $7.5 million.

Indeed, several months before the expiration of the extension term, Med D filed an action against the Defendants in the Superior Court of California, Central District, in the County in Los Angeles, seeking, among other things, return of the $7.5 million.[8] That action was removed to the Federal District Court for the Central District of California, Western Division, sitting in Los Angeles.[9] That action was removed once again to the Federal District for the Northern District of Illinois (the Chicago Action).[10] Med D and several, but not all, of its affiliates filed petitions for relief with this Court in late November of 2004 under chapter 11. The Chicago Action lay dormant by mutual agreement of the parties pending the confirmation of a plan of reorganization or liquidation by Med D and its affiliates.

Under the terms of the Second Amended Plan of Reorganization, the debtor's pre-petition claims, including those against the Defendants, were assigned to the newly formed Chartwell Litigation Trust. On November 24, 2004, the Plaintiffs filed the complaint beginning this adversary proceeding. Thereafter, the Plaintiffs removed the Chicago Action to this Court and it was consolidated with the adversary proceeding. The principal claim is that the pre-petition payment of $7.5 million

from Med D to the Defendants can be recovered by the estate either because it was for no value whatsoever, assuming the First Amendment never became valid and enforceable, or, alternatively, because it was not for reasonably equivalent value. Defendants have also raised counterclaims alleging actual and consequential damages from an alleged breach of contract under the SPA, as modified.

In the Pretrial Statement, the Defendants listed Mr. Peltz as their single expert on all issues of business valuation. The Plaintiffs filed a motion in limine to exclude all of Mr. Peltz's testimony on the ground that he does not qualify as an expert on valuation of all of the shares of a privately held health care services company. This motion gave rise to the Court's exercise of its gatekeeper function in excluding expert testimony that is neither relevant nor reliable.

After reviewing the motion and memorandum in opposition to the motion, and holding some preliminary oral arguments, the Court ruled that it made more practical sense to conduct a voir dire of the proposed expert witness and then determine whether the motion in limine should be granted at the conclusion of the voir dire. The voir dire took place for the better part of three business days,[11] with active participation by the Court in that process.

### Discussion

 Rule 702 of the Federal Rules of Evidence provides:

---

**8.** *Med Diversified, Inc. v. Addus Healthcare, Inc.*, Case No. BC272609, 2002 WL 32791580.

**9.** Case No. CV–02–03911 AHM (JTLx).

**10.** Manning, J.

**11.** The voir dire took place over the better part of the day on September 16th, 26th and 30th of 2005.

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. In determining whether expert testimony is admissible under Rule 702, the Court is charged with the task of ensuring: (1) the evidence is relevant, (2) the expert is qualified, and (3) the expert's testimony rests on a reliable foundation.[12] *See Amorgianos v. National R.R. Passenger Corp.,* 303 F.3d 256, 265 (2d Cir.2002)(relying on *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Under *Daubert,* the Court has a duty to "ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Amorgianos,* 303 F.3d at 267.

■ In determining whether expert testimony is reliable, the Supreme Court has identified a number of factors which may be considered, including: (1) whether a theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error and the existence and maintenance of standards controlling the techniques operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community. *See Daubert* at 593–94, 113 S.Ct. 2786; *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Thus, the inquiry by the trial court in performing its discretionary role as the gatekeeper must be a flexible inquiry that "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the ... court's belief as to the correctness of those conclusions." *Amorgianos,* 303 F.3d at 266.

■ The trial court's inquiry must ensure that every step of the expert's analysis is reliable. *Amorgianos,* 303 F.3d at 266. In doing so, the court has to "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* If the court determines that either the data, methodology or the studies upon which the expert's opinion is based are inadequate to support the expert's conclusions, then the court must exclude the expert's testimony. *Id.* at 266. While minor flaws in an expert's reasoning will not require exclusion, the court must exclude the evidence "if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Id.* at 267 (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 745 (3d Cir.1994)).

---

**12.** In general, the first inquiry the court must make is whether the proffered testimony is relevant under Rule 401, which defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. *See Amorgianos,* 303 F.3d at 265. Because there is a sufficient basis to exclude the testimony on other grounds, the Court declines to address the issue of relevancy as a basis for exclusion as moot.

### 1. Peltz's Qualifications as an Expert Witness on Valuation

█ Rule 702 requires that an expert be qualified "by knowledge, skill, experience, training or education . . . ." Fed.R.Evid. 702. Mr. Peltz testified on voir dire that he has no peer-granted certifications as an expert on business valuations, and that his Expert Report is not to be read as a certified business valuation report in contrast to the certified business valuation report of Plaintiffs' expert witness, Mr. Cimasi. *See* Trial Tr. of Sept 26th at p. 79 and Sept. 30th at pp. 130–34. Moreover, Mr. Peltz's testimony and his report reveal that he has no formal education or training in business valuation. *Id.*, *see also* Expert Report of Scott P. Peltz (Peltz Report), dated July 18, 2005, Trial Ex. 213, at Appendix A, pp 3287–91. By his own admissions, Mr. Peltz is not qualified as a business valuator.[13]

Mr. Peltz also admitted repeatedly that he personally does not issue business valuation reports, although he relies upon members of his support staff who are certified business valuators for their input. *See* Trial Tr. of Sept. 16th at p. 175–78; Sept. 26th at p. 79, and Sept. 30th at p. 133–34. As Plaintiffs' counsel properly pointed out, the Defendants did not call the persons who provided those inputs to testify and be subject to cross-examination, and the alleged inputs of those persons cannot be relied upon as a basis for finding Mr. Peltz an expert witness on business valuation. This Court is not prepared to admit an Expert Report submitted by a corporate entity; the person who signs the report has to testify until the admission of his Report for all evidentiary purposes has been stipulated to, which did not occur in this adversary proceeding. The Plaintiffs reserved their right to ob-

ject to the admission of the Peltz Report and to cross-examine him concerning his purported expertise and other matters arising in his direct testimony. Moreover, Mr. Peltz admitted that his Report cannot be considered a certified business appraisal of value because it does not meet uniform standards for professional appraisal practices that are generally accepted by professional business appraisers. *See* Trial Tr. of Sept. 16th at pp. 175–78 and Sept. 30th at pp. 133–34.

In effect, the Defendants urge this Court to accept a lower standard of expertise to support Peltz' Report and testimony, averring that he did not have to be certified by peer-groups as a business valuation appraiser. Relying on *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir.1995) and *Nimely v. City of New York*, 414 F.3d 381 (2d Cir.2005), the Defendants argue that Mr. Peltz does not need to be certified as a business valuator in order to be qualified as an expert witness on valuation. However, in *McCullock*, the Court held that the expert was qualified because he had sufficient experience in the field at issue to overcome his lack of formal training and certification. In this case, Mr. Peltz's experience is inadequate to overcome his lack of formal training and certification. Moreover, in *Nimely*, the Court did not determine whether the expert was qualified, but instead held the District Court should have excluded the expert's testimony because his methods were unreliable. 414 F.3d at 396–97.

This Court does not accept Defendants' representations and argument that his substantive experience over the past twenty-plus years as an accountant and as a liquidating agent or bankruptcy trustee in bringing avoidance actions in the bank-

---

**13.** Mr. Peltz specifically testified: "I'm not a certified valuation expert, and I don't issue valuation reports." Trial Tr. of Sept. 26th at p. 79.

ruptcy court add up to a satisfactory substitute for formal education and training in business valuations and in peer-recognition in this sub-branch of substantive expertise in business valuations, especially in such a unique and highly regulated business of in-home health care services. As stated above, Mr. Peltz admitted during his voir dire that he has no experience in preparing valuation reports and very little hands-on experience in serving as a paid consultant in the health care industry.[14] Mr. Peltz's principal claim for expertise is a few speeches and short articles on health care insolvencies.[15] *See* Peltz Report at Appendix A, pp. 3287–91; *see also* Trial Tr. of September 30th at pp. 132–33. This Court declines to find that Mr. Peltz' thin record is an adequate and reliable substitute for extensive and direct experience in valuing businesses in this sub-industry as a consultant or as an expert witness in fraudulent transfer actions of this character before the federal district or bankruptcy courts.

Nevertheless, relying on *Nimely*, Defendants argue that Mr. Peltz's experience satisfies the "liberal" standard for admission of expert testimony under Rule 702. However, not only did the Court in *Nimely* decline to determine whether the expert was qualified, but the Court also stated:

> The shift under the Federal Rules to a more permissive approach to expert testimony, [ ] did not represent an abdication of the screening function traditionally played by trial judges. To the contrary, as *Daubert* explained, Rule 702 governs the district court's responsibility to ensure that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.' *Daubert*, 509 U.S. at 589[, 113 S.Ct. 2786]. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137[, 119 S.Ct. 1167, 143 L.Ed.2d 238] ..., the Court clarified that, whether a witness's area of expertise was technical, scientific, or more generally 'experience-based,' Rule 702 required the district court to fulfill the 'gatekeeping' function of 'mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'

*Nimely*, 414 F.3d at 396. As set forth below, not only does Mr. Peltz fail to qualify as a business valuation expert, but, in performing its gatekeeper role, this Court must also exclude Mr. Peltz's testimony as unreliable because he did not employ the same level of intellectual rigor that characterizes the practice of an expert in the field of business valuation.

Furthermore, Mr. Peltz found himself in what this Court perceives is a very serious ethical conflict as a result of his prior engagements in which he served as a fraud auditor in the National Century Financial Enterprises (NCFE) cases, which were filed as related Chapter 11 cases in 2002 with the Bankruptcy court for the Southern District of Ohio, sitting in Columbus. First, in preparing his Report for this case, Mr. Peltz deliberately chose not to use information he personally acquired

---

14. Mr. Peltz identified three different health-care matters he had some involvement with, Doctor's Hospital, Edgewater and Grant Hospital, and North Suburban Clinic, where he apparently played some part in the restructuring efforts of these entities. *See* Trial Tr. of Sept. 16th at pp. 152–55.

15. When asked by the Court whether he had ever authored any substantial articles published by any leading business, accounting or economic journals, Mr. Peltz replied that he had not. *See* Trial Tr. of Sept. 16th at pp. 166–67.

about the massive fraud committed by the principals of NCFE in the securitized financing of, among many others, the two debtors here, Tender Loving Care (TLC) and Med D. This would have been probative on the issue, raised by Mr. Wright in his direct testimony, whether Med D could close the transaction with Addus, given that Med D was increasingly reliant upon NCFE as a principal source of funding for the transaction when its "deal" with the Swiss investment bankers was taken off the table. *See* Trial Tr. of Sept. 26th at pp. 151–55.[16] Second, Mr. Peltz knew that at least two of the principal directors of NCFE also served on the Board of Directors of Med D, and one of the subordinate issues in this adversary proceeding is whether the Board granted its corporate authorization to enter into the First Amendment. So either Mr. Peltz's testimony is biased because he had formed a preconception of NCFE's role in the relevant Med D acquisitions of the stock of the TLC entities and the proposed acquisition of 100% of the shares of Addus; or, alternatively, Mr. Peltz deliberately chose not to apply his existing knowledge when it was directly relevant to issues he knew had been raised in this case from reviewing the transcripts of the depositions by the time he completed his Report. On either of these grounds alone, his direct testimony is not admissible.

### 2. Reliability of Peltz's Expert Opinion

■ Even if Mr. Peltz were found to be otherwise qualified as an expert on business valuation, his testimony is still inadmissible because he showed a discernible measure of negligence in purportedly applying the alleged professional standards

and techniques found in the published practical treatises, including the standards and techniques published in the writings of Dr. Shannon Pratt and his co-authors, which were repeatedly propounded by both the Defendants and the Plaintiffs during the respective voir dire and testimony of both Mr. Peltz and Mr. Cimasi. This was thoroughly explored in the lengthy and detailed cross-examination of Mr. Peltz by counsel for the Plaintiffs. The Court cannot accept the testimony of an alleged expert in business valuations when he failed to employ the necessary peer-reviewed methods of business valuation, when he based his analysis on inadequate data, and when he thoroughly conflated the discreetly different concepts of gross cash flow and net cash flow from operations.

The methodology used by Mr. Peltz in determining the value of Addus consisted of two separate valuation techniques: (1) a Guideline Company Multiple Approach ("Company Approach") and (2) a Guideline Transaction Multiple Approach ("Transaction Approach"). *See* Peltz Report, Trial Exhibit 213, at pp. 3257–58. Yet the leading authorities on business valuation, including the authority most cited by the parties, Dr. Shannon Pratt, "recognize that the most reliable method for determining the value of a business is the Discounted Cash Flow ('DCF') Method." *Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y.2003)(citing Shannon P. Pratt et. al., Valuing A Business: The Analysis and Appraisal of Closely Held Companies 154 (4th ed. 2000)("Regardless of what valuation approach is used, in order for it to make rational economic sense from a financial point of view, the results should be compatible with what would result if a

---

**16.** Mr. Peltz testified that he did not disclose his involvement with NCFE in his resume or his report. *See* Trial Tr. of Sept. 26th at 153.

well-supported discounted economic income analysis were carried out.")), *aff'd*, 99 Fed.Appx. 274 (2d Cir.2004). During his testimony, even Mr. Peltz recognized that the DCF method is commonly used to value 100% of the equity of a privately held company. *See* Trial Tr. of Sept. 30th at p. 64. Yet he did not use the DCF method in determining the value of the Addus shares. *Id.* at pp. 68–69.

In *Lippe*, the court excluded the testimony of a business valuation expert based, in part, on the expert's failure to use the DCF method in determining the value of the business. The court held "[b]y failing to use the DCF method and relying solely on the comparable companies method, [the expert] did not have an ability to do a 'check' on his determinations." *Lippe*, 288 B.R. at 689. Accordingly, the expert's testimony was excluded as unreliable. *Id.* at 701.

For essentially the same reason, Mr. Peltz's failure to use the DCF method amounts to a material flaw in his methodology sufficient to bar his testimony as an expert witness because his conclusions lack "good grounds." *See Amorgianos*, 303 F.3d at 266. Although Mr. Peltz used two methods in determining the value of Addus, both approaches are considered "market" approaches which apply a multiple computed from data derived from other alleged comparable companies. In contrast, the DCF method is considered an "income" approach to valuation that uses data derived from the target company itself to compute the current value of the projected future economic benefit of owning the company. Mr. Peltz never determined that the DCF method was inappropriate as a valuation method under the circumstances, and he even considered using the DCF method, stating at one point in his testimony: "[t]he methodology is appropriate. No question." Trial Tr. of Sept. 30th at p. 68. For some unknown reason, Mr. Peltz did not use the DCF method and he failed to offer an adequate explanation why he did not do so. Instead, he testified that he simply ascertained the method he used was reliable. *Id.* at 67. As in *Lippe*, this Court finds that Mr. Peltz's use of only two "comparable companies" methods simply did not provide the necessary "check" on the value he arrived at that would render that value a reliable measure of the company's worth.[17]

This conclusion is further supported by the fact that Mr. Peltz testified that he only performed a second analysis using the Transaction Approach as a "check" on the results from his analysis using the Company Approach. *See* Trial Tr. of Sept. 26th at pp. 60–61 and Sept. 30th at pp. 59–60. He stated: "if I used the transaction approach and reached a wildly variant conclusion, I'd have to go back and consider my methodology." Trial Tr. of Sept. 26th at pp. 60–61.[18] However, Mr. Peltz also testified that although he believed he had good data for his Company Approach, he did not believe he had a very good set of transactions for use in performing an analysis under the Transaction Approach. *Id.* Mr. Peltz never provided any explanation why he believed the Transaction Approach could serve as a test for the reliability of the Company Approach when, by his own

17. Plaintiffs' expert, Mr. Cimasi, used three methods in determining the value of the Addus shares: (1) the DCF method, (2) the Guideline Company Valuation Method, and (3) the Direct Market Comparable Transactions Method.

18. Mr. Peltz provided no source of authority for using the Transaction Approach as a test of reliability for his Company Approach, stating only "the source is a professional judgment." Trial Tr. at p. 61.

admission, his analysis using the Transaction Approach was itself unreliable.

Moreover, in deriving a value for Addus using both the Company and Transaction approaches, Mr. Peltz depended on databases of research findings of only ten allegedly comparable privately held companies engaged in home health care and related industries. *See* Trial Exhibit 213 at pp. 3277 and 3279. Mr. Peltz testified that he did not do any independent analysis of these companies, and did not independently analyze the data from the databases from which he derived his figures—"Mergerstat" and "Factset." *See* Trial Tr. of Sept. 30th at p. 55. In choosing the companies and transactions upon which his analysis is based, Mr. Peltz admittedly never considered the nature or products of the businesses, or the market in which these businesses operated. *Id.* Thus, the data on which Mr. Peltz's conclusions are based is simply inadequate.

Further, in computing a value under the Transaction Approach, Mr. Peltz applied a discount of 25% for the "illiquidity" of the business, even though the Transaction Approach presumably uses data from actual transactions of privately held companies that are similar to the transaction at issue. As a result, "illiquidity" is already built into the results. When asked whether he had any support for applying such a discount, Mr. Peltz replied: "I haven't researched that. It's common—I can tell you that it's been my common practice." Trial Tr. of Sept. 30th at p. 63. However, without this discount, Mr. Peltz would have reached a "wildly variant" conclusion,

which, by his own testimony, would have forced him "to go back and consider [his] methodology." Trial Tr. of Sept. 26th at pp. 60–61

The results of Mr. Peltz's analyses from both methods are set forth in Exhibit C of the Peltz Report. *See* Trial Exhibit 213 at pp. 3276–78. The results reveal that Mr. Peltz arrived at comparable values using both methods. He arrived at a value of $77,677,000 using the Company Approach and $73,860,000 using the Transaction Approach. However, a closer look at the numbers reveals that in applying the Company Approach, Mr. Peltz first computed two values using two separate multiples, Enterprise Value/Revenue (EV/R) and Enterprise Value/Cash Flow from Operations (EV/CFO), to arrive at two separate values for Addus, and then gave each value a weight: 33.3% for the EV/R value and 67.7% for the EV/CFO value. After adding the two weighted values and subtracting debt, Mr. Peltz arrived at a single value that was very close to the value he arrived at using the Transaction Approach. Yet Mr. Peltz failed to explain adequately why in his application of the Company Approach he gave the value he arrived at using the EV/CFO multiple a weight of 67.7%, 2/3 greater than the value he arrived at using the EV/R multiple, which was significantly higher than the EV/CFO value.[19] Absent a sufficient explanation for the weights assigned to these two values, Mr. Peltz's entire analysis is questionable because had he assigned different weights in applying the Company Approach, the value he arrived at may have

---

**19.** Mr. Peltz's explanation for assigning a greater weight to EV/CFO was that he believed the EV/R value should receive less weight because prospective buyers would see adjustments to the company's financial statements and thereby place a greater significance on factors other than revenue. *See*

Trial Tr. of Sept. 26th at p. 46. Mr. Peltz also stated that his weighting was based on the coefficient of variation he calculated for each multiple, but, as explained in more detail below, this explanation has no valid basis. *See* FN 23.

been significantly divergent from the value he arrived at using the Transaction Approach.

Further, in applying the Company Approach, Mr. Peltz used a critical entry from the audited financial statements prepared by BDO Seidman for the calendar year ended December 31, 2001—net cash flow from operations, but that accounting entry does not provide the empirical basis for directly drawing any valid inferences for determining the business valuation of the controlled shares of the defendant Addus. To derive the value for 100% of the shares of Addus, major adjustments would have to be made to the balance sheet in order to determine the net effect on the value of contingent liabilities and contingent assets, among other things.

Testimony revealed that in computing a multiple based on cash flow, the established method used by Mr. Peltz's only source of authority for using such a method, Dr. Pratt, is to divide the enterprise value by gross cash flow, not net cash flow from operations. *See* Trial Tr. of Sept. 30th at pp. 6–10. As plaintiff's counsel pointed out, there is a critical difference between the two figures—unlike net cash flow from operations, gross cash flow does not include working capital, which takes into account changes in the company's assets and liabilities. *Id.* Mr. Peltz was not able to provide an explanation why he deviated from established valuation procedures, nor was he able to point to any authority to support the use of net cash flow from operations, as he defined it, as a valid technique to compute a Guideline Company multiple.[20] Nor did Mr. Peltz test the validity of this method against the

company's historical performance because, as he admitted during his testimony and in his deposition, he did not study the actual financial performance of the company.

Moreover, the variable Mr. Peltz chose to use, net cash flow from operations, actually had an inverse relationship with the financial well-being of the company. Testimony revealed that as the company's working capital decreased, the net cash flow from operating activities increased, which in turn increased the value of the company that Mr. Peltz derived by using the net cash flow from operating activities multiple. *See* Trial Tr. of Sept. 26th at p. 214. Yet, in general, a decrease in working capital typically indicates a decline in the health of a company. Indeed, testimony indicated that during the time period for which Mr. Peltz computed a value based on a net cash from operating activities multiple, 2001, Addus increased its checks against future deposits by 800%, and Mr. Peltz's analysis did nothing to compensate for this increase. *Id.* at 218. In addition, Mr. Peltz admitted that net cash flow from operations was substantially higher in 2001, the only year for which Mr. Peltz performed a value analysis using the net cash from operating activities multiple, than for any other year in Addus's financial history. *Id.* at 241–42.

Finally, Mr. Peltz testified that he believed that a multiple derived by using the net cash flow from operations figures for the guideline companies was reliable because his analysis revealed that it was closely correlated with another commonly used benchmark—earnings before interest, taxes, depreciation and amortization (EBITDA).[21] *See* Trial Tr. of September

---

**20.** Mr. Peltz stated, in effect, that he is free to develop any reliable measure for use in placing a value on a company, regardless of whether Dr. Pratt has included that same measure in his book. *See* Trial Tr. of Sept.

30th at p. 17. The problem is that Mr. Peltz has not shown his measure to be reliable.

**21.** Mr. Cimasi used EBITDA in calculating one of the multiples used in his guideline company approach.

26th at p. 242. Mr. Peltz testified that he believed the two were closely correlated because their coefficient of variation was similar.[22] *Id.* at 244. However, in calculating the coefficient of variation for the EBITDA figure, Mr. Peltz excluded one of the guideline companies—Gentiva, but he did not exclude Gentiva from the calculation of the coefficient of variation for the net cash flow from operations figure. Mr. Peltz testified that the exclusion was done for the EBITDA calculation because Gentiva was an "outliner" that threw the calculation off. *Id.* at 244–45. Mr. Peltz never adequately explained to this Court's satisfaction why Gentiva was an outliner for the EBITDA calculation but was not an outliner for the net cash flow from operations calculation, casting even more doubt on the reliability of his methods.[23]

The Supreme Court has clearly stated: "nothing in either *Daubert* or the Federal Rules of Evidence requires a ... court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). As such, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266; *Nimely*, 414 F.3d at 396–97. Mr. Peltz's expert opinion and testimony were loaded with multiple *ipse dixits*. Accordingly, the Court must exclude the expert valuation opinion of Scott P. Peltz on this ground as well. His testimony did nothing to assist this Court in performing its role as the finder of fact on the material issues in this adversary proceeding; indeed, his testimony made this Court's role even harder to perform.

### 3. Application of Black–Scholes Model for Valuing a Minority of Publicly Traded Shares.

As to the issue of applying the Black–Scholes Method for valuing the $7.5 million allegedly paid for the six and a half month "option" for acquiring 100% of the privately held shares of Addus, notwithstanding the purported stipulation between the parties that this Method is appropriate, and assuming, as Plaintiffs' counsel argued, that each of the variables in the Black–Scholes model could be instantiated or filled in; the parties have not cited a single case, either in a federal bankruptcy or federal district court, in which that court accepted as a recognized methodology the application of the Black–Scholes Method to valuing an option in 100% of

---

**22.** Mr. Peltz testified that the coefficient of variation is a measure of how tightly grouped the data is. The smaller the number, the more tightly grouped the data is, and the more tightly grouped the data is, the more reliable the data is. *See* Trial Tr. of Sept. 30th at p. 140.

**23.** Mr. Peltz also testified that the coefficient of variation for the cash flow multiple was much lower than for the revenue multiple, *see* Trial Tr. of Sept. 30th at p. 142, which is one reason he chose to give the revenue multiple a 33% weight (and the net cash flow multiple a 67% weight). *See* Trial Tr. of Sept. 26th at p.

26. Not only did Mr. Peltz fail to adequately explain why he chose 33% (and not some lower or higher number), but because he failed to adequately explain why he excluded Gentiva from the EBITDA multiple and not from the revenue and cash flow multiples, this Court not only cannot accept his claim that the cash flow multiple was closely correlated with the EBITDA multiple, but this Court also cannot accept his claim that the cash flow and revenue multiples would have been so divergent had he excluded Gentiva from the calculation of those multiples as well.

controlled shares in a privately held company.[24] This Court is not prepared to embark on a cruise down this unexplored river in the heart of the jungle in order to discover the application of this Method outside the principal context in which it has been customarily applied, namely, to valuing an option for a minority of *publicly traded* shares. *See e.g., Mathias v. Jacobs,* 238 F.Supp.2d 556 (S.D.N.Y. 2002)(Black–Scholes "is used pervasively by virtually all publicly held companies, and pervasively in option trading."); *Cramer v. Comm'r Internal Revenue,* 101 T.C. 225, 242, 1993 WL 369030 (1993)(Black–Scholes was specifically designed to place a value on publicly traded options.). The Black–Scholes Method has simply not been shown to provide a reliable measure of the value of an option to purchase 100% of controlled shares in a privately held company and the parties failed to set forth any credible evidence otherwise.

Most significantly, Mr. Peltz admitted that if the exercise price of the option were in excess of $106 million for a company he valued as of the date of the unsigned First Amendment/Option/Extension agreement, February 14, 2002, at $79.5 million, no reasonably prudent investor would have paid $7.5 million for an option for a six and a half month period of time to purchase the company. *See* Trial Tr. of Sept. 30th at pp. 114–117. In this respect, his admission is directly contradictory to his report, but more importantly, refutes his own client's fundamental position in this adversary proceeding, as evidenced by the testimony of Mr. Andrew Wright, the controlling shareholder of Addus. The Court appreciates Mr. Peltz's candor, but

that hardly rises to the level of finding that his proposed direct testimony is either reliable or relevant.

Finally, although his Court is fully satisfied that the direct testimony of the proposed expert witness, Scott P. Peltz, has been properly excluded under the applicable standards, the Court also finds, assuming for purposes of this opinion, that even if Mr. Peltz's report and testimony could be admitted, for the same reasons of unreliability set forth above, his report and testimony do not have any probative weight.

### *Disposition*

 The Plaintiffs' motion to exclude the Peltz Report and the expert testimony on direct and cross-examination of Scott P. Peltz is granted, in part, as to the proposed expert's direct testimony, but the motion is denied, in part, to the effect that Mr. Peltz may testify as a rebuttal witness, limiting his testimony to challenging the methodology used and applied by the Plaintiffs' proposed expert witness on business valuation, Robert Cimasi. Even though Mr. Peltz has completely failed to demonstrate his expertise in reaching a valuation number for the 100% controlled shares of Addus or for the true economic value of the option price, the Court finds and concludes that he has sufficient familiarity with, even if insufficient mastery of, the professional literature on business valuations to serve in the capacity as a rebuttal witness, which the parties have agreed should take less than four hours to complete, by raising some critical issues of methodology concerning the reliability and relevance of Mr. Cimasi's expert report, which, in turn, may assist this Court in

---

**24.** The institutional settings of cases filed in the tax courts, state matrimonial courts, or corporate litigation in the Delaware Chancery Courts are so astonishingly different in focus that this Court cannot treat those precedents as having equal dignity and comparability to federal bankruptcy and district court adversary proceedings to determine value in fraudulent transfer litigation.

determining whether Mr. Cimasi's Report and Testimony satisfies the *Daubert* standard and is or is not admissible, or if it is admissible, what weight it should be given. Quite to the point, the Plaintiffs' counsel has conceded that it has no objection to this Court's hearing Mr. Peltz's rebuttal testimony on the methodological issues and their application in this adversary proceeding.

Once Mr. Peltz concludes his rebuttal testimony, the Court may then be in a position to determine the admissibility or weight, in whole or in part, of Mr. Cimasi's report and testimony and then proceed further to the conclusion of this trial, and, with the assistance of counsel in their respective post-trial submissions, determine the remaining issues in this adversary proceeding. Counsel have already stipulated that all of the parties and witnesses who were to be called have been called, with the minor exception of in-house counsel for Addus, with respect to which this Court is awaiting final word.

**SO ORDERED.**